UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | CRIMINAL NO. 20-cr-10145-FDS |
| v. ) | |
| ) | |
| SHAWN HERRON, ) | |
| Defendant. ) | |

**GOVERNMENT'S OPPOSITION MEMORANDUM TO DEFENDANT'S MOTION TO SUPPRESS STATEMENTS (Docket No. 61)**

The government respectfully files this memorandum in opposition to defendant's motion to suppress statements (Docket No. 61).

**RELEVANT FACTS**

The investigation in this case began in September 2019. United States Postal Inspector James J. Foley III ("Inspector Foley") referred the matter to United States Postal Service Office of Inspector General Special Agent Thomas DiCarlo ("Agent DiCarlo") who began investigating the theft and diversion of certain priority mail parcels thought to contain narcotics. In connection with this investigation, Inspector Foley had several conversations and interactions (both in person and telephonically) with defendant, who, at the time, was the manager of the Fall River Post Office. Inspector Foley is well known to defendant as they have had interactions in their respective professional capacities over the years regarding other, unrelated investigations that Inspector Foley has conducted. Nevertheless, defendant suggests the first time he met Inspector

Foley was on February 11, 2020.[1]

On February 11, 2020, Agent DiCarlo and Inspector Foley went to the Fall River Post Office to attempt to speak to defendant and to effectuate an arrest.[2] Upon arrival at the Fall River Post Office, Inspector Foley asked defendant if he and Agent DiCarlo could speak with him privately. Defendant agreed and led the two into his office. As the men were walking toward the office, Agent DiCarlo introduced himself and showed defendant his credentials.

Once inside the office, they closed the door for privacy and defendant sat in the chair closest to the door. The conversation was cordial. The investigators told defendant that they were going to provide him with his *Miranda* warnings prior to any questioning. Inspector Foley will testify[3] that he recalls defendant attempting to call his union representative, but then deciding to go forward with the interview without reaching his union representative; Agent DiCarlo does not recall whether defendant made any calls. Both investigators will testify that

---

[1] *See Affidavit of Defendant in Support of Motion to Suppress Statements* (dkt. 62) at ¶ 4 ("I was approached by two men, who identified themselves as United States Postal Inspectors and who I now know to be Special Agent Thomas DiCarlo and Inspector Jim Foley.").

[2] A criminal complaint (20-mj-6016-MPK) issued on February 10, 2020.

[3] However vaguely, defendant seems to allege he invoked his right to counsel during questioning, and thus, appears, (however minimally) to meet the requirements entitling him to a hearing. Nonetheless, it is well-settled that defendant must testify and subject himself to cross examination prior to any presentation of evidence by the government. *United States v. Phillipos*, 849 F.3d 464, 467-69 (1st Cir. 2017) (district court properly struck defendant's affidavit contending that his confession was involuntary after defendant refused to submit to cross-examination); *United States v. Baskin*, 424 F.3d 1, 3 (1st Cir. 2005) (upholding district court's decision to strike defendant's affidavit where defendant bore the burden of establishing that he had an expectation of privacy under the Fourth Amendment and defendant refused to take the stand).

defendant did not invoke his right to counsel at any point during the exchange. Both investigators will testify that they did not take defendant's cell phones away from him during the interview although they requested that he not use them while they were speaking.

Defendant read and signed the Miranda waiver. *See 2/12/20 Memorandum of Interview of Shawn Herron with Attachment 1 (Miranda Form) and Attachment 2 (Sworn Statement of Shawn Herron)* attached herewith at Exhibit A. During the interview, defendant not only confessed to the crimes charged but also handwrote a sworn statement. *Id.* Only after the conversation was complete did agents tell defendant he was under arrest. Defendant consented to the search, *inter alia*, of both his cell phones. *Id.* at 3.

Upon learning that he was under arrest, defendant asked agents to delay placing him in handcuffs until they had left the Fall River Post Office so that he would not be embarrassed in front of his employees. Agents complied.

**ARGUMENT**

A. <u>The Interview was Noncustodial.</u>

Defendant's allegation that his interview was custodial is false; thus, the obligation to warn him of his rights under *Miranda v. Arizona* were not triggered. 384 U.S. 436, 444 (1966) (rights triggered only when individual has been "taken into custody or otherwise deprived of his freedom of action in any significant way."); *see Rhode Island v. Innis*, 446 U.S. 291, 297 (1980). Determining whether an individual is in custody for purposes of *Miranda* is a two-step examination asking "'first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.'" *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004), *quoting Thompson v. Keohane*, 516 U.S. 99, 112 (1995). The first inquiry looks at "the

objective circumstances of the interrogation, not [...] the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994); *see also Berkemer v. McCarty*, 468 U.S. 420, 442 ("A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time."); *Yarborough* , 541 U.S. at 668-9 ("the relationship between a suspect's past experiences and the likelihood a reasonable person with that experience would feel free to leave often will be speculative ...[and] police officers [need not] consider these contingent psychological factors when deciding when suspects should be advised of their Miranda rights"). The second inquiry is whether there was "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Yarborough* 541 U.S. at 663 (internal quotations omitted).

An individual may be considered to be in custody for Fifth Amendment purposes only when the circumstances of the interrogation "would cause a reasonable person to have understood his situation to be comparable to a formal arrest." *United States v. Guerrier*, 669 F.3d 1, 6 (1st Cir. 2011).   The First Circuit has identified four factors to guide courts in assessing the custodial nature of an interrogation.  *United States v. Crooker*, 688 F.3d 1, 11 (1st Cir. 2012).  Those factors include "where the questioning occurred, the number of officers, the degree of physical restraint, and the duration and character of the interrogation."  *Id*.

Here, analysis of all four factors leads only to the conclusion that the defendant was not in custody when he led two agents, one of whom he had known for years, to his office so that they could speak privately.  Although the agents had an arrest warrant, they did not tell defendant that he was going to be arrested until after the interview concluded.  The conversation, which lasted approximately one hour, was so cordial and cooperative that agents agreed not to handcuff

defendant until he was out of view of his fellow postal employees. Thus, *Miranda* warnings were not required.

B.   Defendant's Waiver was Voluntary, Knowing, and Intelligent.

Nevertheless, agents provided *Miranda* warnings, which defendant waived. The signing of a written waiver form is strong, though not conclusive, proof of the validity of that waiver. *See North Carolina v. Butler,* 441 U.S. 369, 373 (1979). To determine the voluntariness of a waiver, it is necessary to look at the totality of the circumstances, including "the tactics used by the police, the details of the interrogation, and any characteristics of the accused that might cause his will easily to be overborne." *See United States v. Palmer*, 203 F.3d 55, 60 (1st Cir. 2000), *quoting United States v. Rohrbach*, 813 F.2d 142, 144 (8th Cir.1987).

In this case, a noncustodial interview took place in the defendant's office. The conversation was cordial. Defendant never asked to leave or terminate the interview. He was unaware that he was going to be arrested. He signed and initialed the waiver form and, after the interview concluded, agreed to write out a sworn statement. Even taking the allegations in his affidavit as true, there is nothing that indicates his waiver was not knowing, voluntary or intelligent.[4]

C.   The Defendant Did Not Invoke His Right to Counsel.

As a general matter, if a suspect requests counsel at any time during the interview, the "rigid prophylactic rule" is that officers cannot subject the suspect to further questioning until a

---

[4] Defendant's voluntary, knowing, and intelligent waiver of the Fifth Amendment also validly waived any Sixth Amendment right that the Court may find existed. A waiver of the Sixth Amendment right to counsel for a post-indictment interview is valid if it is made "knowingly," "intelligently," and "voluntarily." *Patterson v. Illinois*, 487 U.S. 285, 292 (1988). A valid waiver of the Fifth Amendment after receiving the *Miranda* warnings constitutes a knowing and intelligent waiver of the Sixth Amendment right to counsel. *Id*.

lawyer has been made available or the suspect himself reinitiates conversation. *See Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). A thornier issue arises, however, when the individual makes an ambiguous or equivocal reference to counsel during a custodial interrogation. *See Davis v. United States*, 512 U.S. 452, 456 (1994). Necessarily, the applicability of the "rigid prophylactic rule" requires the Court to determine whether (and at what point) the suspect "*actually invoked* his right to counsel." *Davis,* 512 U.S. at 458-59 (emphasis in original).

In *Davis*, after an hour and a half of questioning by naval investigators, the defendant stated "Maybe I should talk to a lawyer." 512 U.S. at 454-55. The investigators proceeded to ask questions intended to clarify whether he was invoking his right to counsel. The defendant subsequently stated: " No, I'm not asking for a lawyer;" and "No, I don't need a lawyer." Investigators then reinitiated substantive questioning of the suspect.

The Supreme Court held that:

> Invocation of the *Miranda* right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney. But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning… Rather, the suspect must unambiguously request counsel. As we have observed, "a statement either is such an assertion of the right to counsel or is not." Although a suspect need not "speak with the discrimination of an Oxford don," he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect.

*Davis*, 512 U.S. at 459 (citations omitted); *see also United States v. Dudley*, 804 F.3d 506, 512 (1st Cir. 2015) (officers need not stop questioning if suspect does not make unambiguous right to counsel).

Again, even taking as true the allegations in defendant's affidavit, he did not unequivocally invoke his right to counsel. Even if he initially had tried to call his union

6

representative, the fact that he chose to continue to proceed with the interview indicates that he did so voluntarily.

## CONCLUSION

For the above reasons, this Court should deny defendant's motion to suppress.

Respectfully submitted,
NATHANIEL R. MENDELL
Acting United States Attorney

By: /s/ Eugenia M. Carris
Eugenia M. Carris
Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

I hereby certify that, on the below date, this document was filed through the ECF system which sends copies electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Eugenia M. Carris
Eugenia M. Carris
Assistant U.S. Attorney

May 10, 2021